UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Lulu Simba Thompson, on behalf of her son, M.C.,                No. 24-cv-3717 (KMM/TNL)

        Plaintiff,

v.                **ORDER**

Lakeville Area Schools,

        Defendant.

---

Plaintiff Lulu Thompson brings this case on behalf of her minor son, M.C., alleging that Defendant Lakeville Area Schools ("Defendant" or "the District")[1] has unlawfully prohibited M.C. from attending his neighborhood school because of his disability. Ms. Thompson claims that Defendant has engaged in discrimination under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, violated Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 701, *et seq.*, and violated the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.01, *et seq.*[2] This matter is before the Court on Plaintiff's Motion for a Temporary Restraining Order, Preliminary Injunction, and Waiver of Bond. ECF 2. The Court held a hearing on the motion on October 7, 2024, at which

---

[1] Defendant identifies itself as "Independent School District No. 194, Lakeville," not by the name provided in Plaintiff's Complaint—"Lakeville Area Schools." Accordingly, the Court refers to the Defendant as "Defendant" or "the District" throughout this Order.

[2] Ms. Thompson also asserts a claim that Defendants violated Section 13.08, subd. 3, of the Minnesota Government Data Practices Act by refusing to respond to a request for data. Compl. ¶¶ 41–46. However, that claim is not relevant to the motion addressed in this Order.

counsel for the parties appeared and presented oral argument. For the reasons that follow, the Plaintiff's request for preliminary injunctive relief is denied.

**BACKGROUND**[3]

### M.C. and His Elementary School Education

Ms. Thompson's son, M.C., is a student who is moving from elementary to middle school within the Defendant's school system. At the start of his school career, M.C. attended John F. Kennedy Elementary School, where in 2017, he was identified as a student with a disability based on language delays. While at JFK, M.C. did well, received supports and services form the school, and established genuine friendships.

On April 1, 2020, while M.C. was a first-grade student, he was involved in a tragic car accident, sustained a severe traumatic brain injury ("TBI"), and lost his father and older brother. His recovery from the accident has been described as a "miracle" by medical professionals. Thompson Aff. ¶ 2.[4] In addition to M.C.'s TBI, he has a secondary disability category of "Speech Language Impairment" ("SLI"). Kuhn Decl. ¶ 4 (Doc. 31).

Because of his TBI, M.C. experienced changes in his fine and gross motor skills, vision, focused attention and concentration, short-term memory, and academic skills. *See* Thompson Aff., Ex. 1, Individualized Education Program ("IEP") (Doc. 23). M.C. also exhibits mild cognitive impairments, slower processing speeds, cognitive inconsistencies, reduced judgment and reasoning, and an increased vulnerability. *Id.* These changes require

---

[3] The parties have both agreed that live testimony was not required and submitted documents in support of their respective positions. This recitation of facts is based upon that record.

[4] Although the paragraphs in Ms. Thompson's affidavit are not numbered, the court refers to them by number based on the order in which they appear.

M.C. to have structure within his environments. In the most recent re-evaluation of M.C. from November 23, 2020, Lakeville Area Schools found that he is eligible to receive special education supports and services under Minnesota's eligibility requirements for TBI.

When he returned to school following his accident, Defendant required M.C. to move from JFK to Lakeview Elementary School ("Lakeview") so that he could receive the supports and services he required through the "DCD focused" program there. Compl. ¶ 6. "DCD" refers to "developmental cognitive disability," which is a state eligibility criterion that "does not include conditions primarily due to a sensory or physical impairment, traumatic brain injury, autism spectrum disorders, severe multiple impairments, cultural influences, or inconsistent educational programming." Compl. ¶ 18 n.7 (citing Minn. Admin. R. 3525.1333, subp. 1). However, Defendant decided that M.C. needed the services available in a DCD classroom.

At Lakeview, the District provided M.C. with an IEP. The goals set forth in M.C.'s IEP include improving the following: (1) reading, writing, and functional abilities; (2) math skills; (3) language skills (both speech and language); (4) strength, balance, and coordination for mobility; and (5) motor planning, attention, and grasp. IEP at 4–13.

During fifth grade, M.C. attended a regular education classroom for small portions of the day, like morning meeting or classroom social times; other than those periods "M.C.'s time with regular education peers was limited to lunch, recess, specials, and field trips or other special events." Kuhn Decl. ¶ 5. As indicated in M.C.'s IEP he is currently in a Federal Setting 3 program, which means he receives more than 60% of his educational services within the special education classroom. *Id.* He receives 230 minutes of direct

special education services each day for his TBI in connection with core academic areas of math, reading, writing, etc. *Id.* At Lakeview, M.C. received those services "within a center-based special education classroom focused on students who receive services for Developmental Cognitive Disabilities . . . or who have similar needs." *Id.* He also receives direct services for speech and language, occupational therapy, physical therapy, and developmental adapted physical education. *Id.*

M.C. adjusted well after his move to Lakeview. Valerie Miller, a Special Education Teacher, and Rebecca Wait, a Regular Education Teacher helped M.C. integrate into the Lakeview student community. M.C. finished fifth grade at Lakeview and is scheduled to attend middle school in the 2024–2025 school year. M.C. had a recent thoraco-lumbar spina fusion surgery. Thompson Aff., Attach. 8. The parties anticipate M.C. will begin middle school in mid-October.

### *M.C.'s Neighborhood Middle School and Other Options*

M.C.'s neighborhood school is McGuire Middle School ("McGuire"). M.C. and Ms. Thompson would prefer for him to attend middle school at McGuire because M.C.'s friends from his neighborhood and classmates from Lakeview will be there. However, in early November 2023, Ms. Miller informed Ms. Thompson that M.C. would not be going to McGuire. Instead, Defendant determined that he would be moved to Century Middle School ("Century"). Thompson Aff., Attach. 2. Ms. Thomson immediately informed Defendant of her concerns with the placement at Century. *Id.*

On November 20, 2023, Defendant held a team meeting to discuss M.C.'s middle school placement. Kane Decl., Ex. 1, 11/20/23 Meeting Notes (Doc. 12-1); Thompson Aff.,

Attach. 3, Notice of Team Meeting (Oct. 16, 2023). Ms. Thompson attended the meeting along with a private education advisor, Kristin McGeary, and personnel from the District.[5] 11/20/23 Meeting Notes. Although they expected Carol Potter, the Director of Special Services for Lakeville Schools, to be there, they learned at the meeting that Ms. Potter was unavailable. *Id.* During the meeting, Ms. Thompson shared her goals concerning M.C.'s middle school placement, and the team considered M.C.'s goals, progress, and needed services. *Id.* ¶¶ 5–6.

A second meeting was scheduled for November 28, 2023, so that Ms. Potter could attend, along with Amy Raffelson (Special Education Coordinator), Ms. Wait, Ms. Miller, Ms. Thompson, and Ms. McGeary. *Id.* ¶ 7. Ms. Thompson again shared her concerns with the team. *Id.* At the conclusion of the meeting, Ms. Potter indicated that the decision about M.C.'s middle school would wait until a decision had been made regarding the City of Lakeville's boundaries. *Id.* Ms. McGeary's notes from the meeting indicate that it was unclear "where the special education classrooms might shift to if at all." *Id.*, Attach. A, 11/28/23 Meeting Notes (Doc. 5-1).

Ms. Thompson wrote to the Lakeville School Board Members on February 21, 2024 to request that they consider adding a DCD classroom to every middle school. Thompson Aff., Attach. 4. She expressed her view that adding a DCD classroom to every middle

---

[5] The other education professionals at the meeting included Ms. Miller, Ms. Wait, Elizabeth Heiderscheit (Speech/Language Pathologist), Chelsea Payne (Occupations Therapist), Shanyn Tuftee (Physical Therapist), and David Deal (DAPE). McGeary Aff. ¶ 4 (Doc. 5).

school would help M.C. go to his home school along with his existing friends from Lakeview, but it would also help all special needs children having similar struggles. *Id.*

### The April 16, 2024 Meeting

On April 16, 2024, District personnel held another meeting with Ms. Thompson and Ms. McGeary. McGeary Aff. ¶ 8. Ms. Potter led this meeting. *Id.* ¶ 10. Lakeville's Middle School Special Education Coordinator, Karin Kuhn, again asked Ms. Thompson to share her goals for M.C.'s education. *Id.* As she had at previous meetings, Ms. Thompson explained that she wanted M.C. to gain "independence, social independence, and create stability with familiar social relationships given his fragile memory." *Id.* According to Ms. Thompson, M.C. does not require a changing table, nor does he require a restroom that can accommodate both a wheelchair and a paraprofessional. Thompson Aff. ¶ 3. "One of M.C.'s goals is to improve his independent mobility and he is able to transition to a standing position and walk approximately 25–30 feet with his walker. There is no reason he cannot use the walker in a restroom." Thompson Aff. ¶ 3. M.C.'s IEP documents that he needs some assistance when he goes to bathroom, specifically when transitioning to a seated position. IEP at 2.

Ms. Potter identified three middle school options within Defendant's school systems—McGuire, Century, and Kenwood Trail Middle Schools ("Kenwood")—and Ms. McGeary's notes from the meeting include a chart with information about each school's special education classrooms:

| McGuire Middle School HS-Lakeville South | Century Middle School HS- Lakeville North | Kenwood Trail Middle Schools HS- Lakeville South/Lakeville North |
|---|---|---|
| <ul><li>Resource program</li><li>Center-Based- ASD focused classrooms<ul><li>4 classrooms</li><li>3 classrooms currently divided by grade</li><li>1 classroom for functional skills/communication-based needs</li></ul></li><li>Related Services <u>all</u> offered</li><li>Center Based caseload- 10:1 and 10 paras</li><li>Resource caseloads - 18:1 and 6 paras</li></ul> | <ul><li>Resource program</li><li>Center-Based - DCD focused classrooms<ul><li>2 classrooms</li><li>Current students are Severe/Profound</li></ul></li><li>Related Services <u>all</u> offered</li><li>Center-Based caseload- 8:1,and 5 paras</li><li>Resource caseloads - 16:1 and 5 paras</li></ul> | <ul><li>Resource program</li><li><u>Center</u>- Based-EBD Focused classrooms</li><li>DCD focused classroom (SOAR)<ul><li>Current students have a variety of disabilities:<ul><li>TBI, OHD, SLD, DCD-Mild/Moderate</li></ul></li></ul></li><li>Related Services <u>all</u> offered</li><li>SOAR Center Based caseload- 9:1 and 3 paras</li><li>Resource caseloads - 18:1 and 5 paras</li></ul> |
| Additional Information:<ul><li>Students in the resource setting are generally working on academics at or 1-2 years below grade level</li><li>Center Based ASD classrooms focus on expected behaviors, social skills, regulation, and communication</li><li>Center Based classroom is in 8th grade wing/hall</li><li>Nearest accessible bathroom is downstairs at the other end of the building</li></ul> | Additional Information:<ul><li>Students in the resource setting are generally working on academics at or 1-2 years below grade level</li><li>Center-Based- DCD focused classrooms<ul><li>Majority in Wheelchairs</li><li>The majority use devices for communication</li></ul></li><li>Focus on basic and daily living skills- toileting, feeding, and safety</li><li>Mostly 1:1 or very small group</li><li>Accessible bathrooms outside of</li></ul> | Additional Information:<ul><li>Students in the resource setting are generally working on academics at or 1-2 years below grade level</li><li>Center Based SOAR students have Mild-Moderate disabilities- working on academics at their level- able to do group work/whole group instruction</li><li>Accessible bathroom is inside the classroom</li><li>Center Based classroom is first floor- all grades mixed</li></ul> |

Kane Decl., Ex. 2, 4/16/24 Meeting Notes[6]; *see also* Kuhn Decl. Ex. A. McGuire has no DCD specific classroom, but both Century and Kenwood do.[7]

Ms. Potter informed Ms. Thompson that the District had selected Kenwood as M.C.'s middle school location. McGeary Aff. ¶ 11. Potter told Ms. Thompson that District personnel had toured all the schools and considered moving a DCD classroom to McGuire, but ultimately the decision came down to issues of "space and accessibility." *Id.*; 4/16/24 Meeting Notes 1–2. Ms. Potter further explained that McGuire is an old building; its classrooms and breakout spaces are not designed for students who need space; to make

---

[6] The entire chart included in Exhibit 2 to the Kane Declaration is pasted here for reference. Although the bottom of the middle column appears to end abruptly, the Court has not excised any portion of the image from the exhibit.

[7] "ASD" refers to autism spectrum disorders, Minn. Admin. R. 3525.1325, subp. 1, and "EBD" refers to emotional or behavioral disorders, Minn. Admin. R. 3525.1329, subp. 1.

changes to the McGuire building so that it can be accessible for those in wheelchairs would require major construction; McGuire lacks sufficient handicap accessible bathrooms; the accessible bathroom near the swimming pool that M.C. uses when he goes swimming at McGuire is too far away from the classrooms and would require him to spend too much time to get there and return to class; and other classrooms at McGuire that are on the first floor level are built for music and art, and they would not be appropriate for a DCD classroom. 4/16/24 Meeting Notes 1–2; McGeary Aff. ¶¶ 11–13. Ms. Potter further explained that Kenwood was selected because it has a DCD classroom already, a pool, and peers from McGuire and Kenwood will eventually all go to the same high school— Lakeville South High School. 4/16/24 Meeting Notes at 2; McGeary Aff. ¶¶ 15–16. The District explains that at the April 16th meeting, "Ms. Thompson agreed that M.C. should be placed in a DCD-focused classroom, but she felt strongly that M.C. should attend McGuire with his peers from Lakeview." Kuhn Decl. ¶ 16.

### *The District's Rationale for Kenwood Placement*

In a declaration filed in opposition to Plaintiff's motion, Ms. Kuhn elaborated on the District's rationale for placing M.C. at Kenwood. Kuhn Decl. ¶ 7. According to Ms. Kuhn, the District decided on such a placement because "the center-based program at Kenwood . . . is more appropriate for M.C., and District staff felt that the District would be better able to meet M.C.'s individual needs at Kenwood. . . ." *Id.* Ms. Kuhn further explained:

> Kenwood Trail houses the SOAR Program, which is focused on students with lower cognitive abilities than their grade level peers. These students typically have medical conditions or

8

complications that impede their learning, primarily, by causing them to learn at a slower, and oftentimes significantly slower, pace than their regular education peers. The SOAR Program allows students to learn at their own pace and offers the opportunity for repetition and practice of academic skills. Given the low student-to-staff ratio, SOAR Program staff are able to individualize academic materials for students in the Program. While the SOAR Program is DCD-focused, it also serves students with other disabilities who have similar needs and learning profiles. For example, the current SOAR Program at Kenwood [T]rail includes two students (aside from M.C.) who receive services for TBI and one student who receives services for Other Health Disabilities ("OHD").

*Id.*

According to Ms. Kuhn, M.C.'s education needs are similar to those of other students in the SOAR Program. Kuhn Decl. ¶ 9. M.C. learns at a slower rate than his regular education peers. *Id.* He also benefits from repetition and practice in his lessons, and the District felt he would best receive those services in a SOAR Program classroom because of their smaller size, calm atmosphere, and fewer distractions. *Id.* ¶¶ 8, 9. During the April 16, 2024 meeting, "everyone agreed M.C. needs to learn in a small classroom that allows for repetition and practice, like the SOAR Program classroom at Kenwood. . . ." *Id.* ¶ 9.

Although the District considered placing M.C. at Century and offered it as an alternative placement to Kenwood, the District felt that the DCD-focused center-based program at Century was not a good fit because "the students in that classroom typically have a label of Severe-Profound, rather than Mild-Moderate, which means they have more significant needs than the students in the SOAR Program at Kenwood. . . ." *Id.* ¶ 10. The District concluded that M.C.'s needs would best be met at Kenwood around peers "more similarly situated to him." *Id.* After attending Kenwood, M.C. would also "attend high

school with at least some of his peers from Kenwood," as the students who attend middle school there are split between Lakeville North High School and Lakeville South High School; Century only feeds into Lakeville North. *Id.* ¶ 11. Lakeville South "is currently M.C.'s neighborhood school so he would attend high school with his peers from Lakeview." *Id.*

The District's staff determined that McGuire would not be a good fit for M.C.'s educational needs during middle school. Kuhn Decl. ¶ 12. Only one of those reasons was bathroom access. *Id.* Although McGuire is generally wheelchair accessible and has one accessible restroom, the accessible restroom is on the other side of the building from the special education classrooms, including McGuire's center-based and resource classrooms. *Id.* Ms. Thompson let the District staff know that M.C. does not require a changing table, but he does need assistance transferring to the toilet and with his clothing. *Id.* Though this information alleviated some of the District's concerns related to the bathroom, others remained, including the fact that the restrooms closest to the special education classrooms are smaller and would not accommodate both M.C. and an adult who could provide him assistance. *Id.* However, these concerns were ultimately secondary to the District, and the "primary concern with placing M.C. at McGuire was the inappropriate nature of McGuire's center-based classrooms, which District staff felt would not be able to meet M.C.'s individual needs." *Id.* In particular, Ms. Kuhn explains that the District was concerned that McGuire's programs focus on students who receive services for ASD, and those programs focus on "behavior regulation, social skills, and sensory integration, rather than individualizing academics." *Id.* ¶ 13. Because behavior regulation is an issue in the ASD-

focused classrooms and the "environment is often loud and not calm," the District felt that placing M.C. in such a program would not serve his individualized needs. *Id.* "M.C. does not have disability-related needs for behavior regulation or sensory integration, . . . which means instruction in those areas would not particularly benefit M.C." *Id.*

Further, the District considered whether M.C.'s educational needs could be met at McGuire without a center-based program like he received in elementary school at Lakeview, but instead "in the resource model, [where] he would have needed a one-to-one paraprofessional with him in the regular education classroom and in the special education classroom because his current academic skills are far below his grade level peers." Kuhn Decl. ¶ 14. The District did not think such a practice would fulfill its obligation to educate M.C. "in the least restrictive environment because M.C. would never be working independently on his academics." *Id.* "In addition, staff would have needed to modify all his core academics to meet him at his level, given he learns at a significantly slower rate than his regular education peers, but it would have been difficult or impossible to individualize general education academics, which District staff again felt was not appropriate for M.C." *Id.*

### *After the April 16th Meeting*

After the April 16th meeting, Ms. McGeary and Ms. Potter exchanged emails about the decision to place M.C. at Kenwood instead of McGuire. McGeary Aff. ¶ 16 & Ex. B. Ms. McGeary "advocated for the creation of a DCD classroom at McGuire to accommodate M.C.," but because of "space and staff limitations, the District declined to add a DCD-focused classroom at McGuire." Kuhn Decl. ¶ 16. As a result, the decision to

11

have M.C. attend a middle school with an existing DCD classroom and the Kenwood placement remained. Ms. Potter emailed Ms. Thompson on April 24th to inform her that a planned tour of McGuire would not take place that day because Defendant had decided not to place a DCD program at McGuire. Thompson Aff., Attach. 6. Ms. Potter asserted that M.C.'s "special education needs are best and most appropriately met in the DCD program at [Kenwood]." *Id.*

Ms. Thompson shares that having M.C. attend McGuire is important for "maintaining his neighborhood friends and classmates from Lakeview. The greatest amount of stability is essential to his emotional well-being which, in turn, is essential to his continued recovery and progress." Thompson Aff. ¶ 4. M.C.'s friends and neighbors have weighed in with their belief that he should be permitted to attend school at McGuire. Popper Aff. (Doc. 6); Cartwright Aff. (Doc. 7); Allen Aff. (Doc. 8); Anderson Aff. (Doc. 9); Fischer Aff. (Doc. 10); Hartman Aff. (Doc. 11).

## DISCUSSION

### I.    Legal Standards

Under Federal Rule of Civil Procedure 65, a district court has the power to grant injunctive relief by issuing either a temporary restraining order or a preliminary injunction. Courts apply essentially "the same standards to a request for a preliminary injunction and temporary restraining order." *Roberson v. Kansas City S. Ry. Co.*, 616 F. Supp. 3d 928, 935(W.D. Mo. 2022). Here, the Court treats Ms. Thompson's motion as seeking a preliminary injunction because the Defendant has received notice of the motion, the matter is fully briefed, and the Court held a hearing. *See C.S. McCrosan Const. Inc. v. Minn. Dep't*

*of Transp.*, 946 F. Supp. 2d 851, 857 n.10 (D. Minn. 2013) (treating a motion for TRO or preliminary injunction as a request for the latter because the plaintiff provided notice to all parties and the issues were fully briefed).

A district court has "broad discretion in determining whether a preliminary injunction should be issued." *Carlson v. City of Duluth*, 958 F. Supp. 2d 1040, 1057 (D. Minn. 2013); *Lankford v. Shermani*, 451 F.3d 496, 503 (8th Cir. 2006) (same). "A preliminary injunction is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant." *Id.* (quoting *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).

When deciding whether to grant a preliminary injunction, the court considers the following four factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest." *Wilbur-Ellis Co., LLC v. Erikson*, 103 F.4th 1352, 1355–56 (8th Cir. 2024) (quoting *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981))). These are commonly referred to as the *Dataphase* factors.

Courts have stated that "the probability of success factor is the most significant." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1342 (8th Cir. 2024) (quoting *Home Instead, Inc.*, 721 F.3d at 497). To demonstrate a likelihood of success on the merits, the moving party must show "a 'fair chance,' not necessarily 'greater than fifty percent,' that it will ultimately prevail under applicable law." *Id.* (quoting *Heartland Acad. Cmty. Church v. Waddle*, 335

F.3d 684, 690 (8th Cir. 2003)). A failure to show a likelihood of success "strongly suggests that preliminary injunctive relief should be denied[.]" *Paisley Park Enters., Inc. v. Boxill*, 253 F. Supp. 3d 1037, 1043 (D. Minn. 2017).

Even when a plaintiff has a strong showing of likelihood of success on the merits, courts should not issue a preliminary injunction if there is no showing of irreparable harm. *C.S. McCrossan Const., Inc.*, 946 F. Supp. 2d at 858. "The failure of a movant to show irreparable harm is an 'independently sufficient basis upon which to deny a preliminary injunction.'" *Sessler v. Davenport, Iowa*, 990 F.3d 1150, 1156 (8th Cir. 2021) (quoting *Watkins, Inc.*, 346 F.3d at 844). "A party seeking relief must demonstrate that the injury is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Jackson v. Macalester Coll.*, 169 F. supp. 3d 918, 921 (D. Minn. 2016) (citing *Packard Elevator v. Interstate Comm. Comm'n*, 782 F. 2d 112, 115 (8th Cir. 1986)). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Kato Eng'g, Inc. v. Hanley*, 367 F. Supp. 3d 918, 923 (D. Minn. 2018) (citing *Rogers Gr., Inc. v. City of Fayetville, Ark.*, 629 F.3d 784, 789 (8th Cir. 2010)).

## II.    Analysis

As explained below, the Court finds that Plaintiff has failed to meet her burden to show that there is a threat of irreparable harm to M.C. if he is required to attend middle school at the location selected by the District. In addition, the Court finds that Plaintiff has

failed to demonstrate a likelihood of success on the merits. Accordingly, the Court concludes that Plaintiff is not entitled to a preliminary injunction.[8]

### A. Irreparable Harm

The Court admires Ms. Thompson's advocacy for her son and is sympathetic to her desire to have him attend middle school with his friends. But neither the record nor the caselaw supports a finding that M.C. will suffer irreparable harm if he attends Kenwood rather than McGuire. First, there is no authority to support the general idea that a student is entitled to attend a particular school and will suffer significant harm if they cannot. Instead, irreparable harm is only found when the educational services themselves are inadequate, not when the school location is at issue.

The Eighth Circuit has upheld a district court's finding that one disabled student who was indisputably "making little progress" in her existing school placement had shown a threat of irreparable harm absent a transfer. *Monahan v. State of Neb.*, 645 F.2d 592, 598 (8th Cir. 1981). And the *Monahan* court affirmed the district court's finding that another disabled student failed to show a threat of irreparable harm from not attending his chosen school where he was instead enrolled at a school that "concededly provides an adequate educational program." *Id.*

The Eighth Circuit has also explained that where an educational institution proposed alternatives for disabled students that would have resulted in inadequate and inferior

---

[8] Because the Court concludes that the Plaintiff is not entitled to a preliminary injunction, it is unnecessary for the Court to resolve the parties' competing positions concerning whether Plaintiff was required to exhaust administrative remedies under the Individuals with Disabilities Education Act.

educational opportunities, the plaintiffs had shown irreparable harm. *Arc of Iowa v. Reynolds*, 24 F.4th 1162, 1180 (8th Cir. 2022) ("*Arc of Iowa II*"), *vacated sub. nom. by,* 33 F.4th 1042 (8th Cir. 2022) (per curiam). The *Arc of Iowa II* court cited cases indicating that irreparable harm was established based on the "lasting impact of education's deprivation on the life of a child," *id.* (quoting *Plyler v. Doe*, 457 U.S. 202, 221 (1982)) (cleaned up), and finding irreparable harm because "even a few months in an unsound educational program can make a world of difference in harm to a child's educational development," *id.* (quoting *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 142 (3d Cir. 2017)) (cleaned up).

Against this backdrop, the Plaintiff fails to make the necessary showing of harm. Plaintiff offers two theories of irreparable harm to M.C. First, she argues that irreparable harm can be presumed when a defendant has violated a civil rights statute. Plaintiff relies on the district court's decision in *ARC of Iowa v. Reynolds*, 559 F. Supp. 3d 861, 877–78 (S.D. Iowa 2021) ("*Arc of Iowa I*") in support of the idea that a violation of a civil rights statute by itself is adequate to establish the necessary harm. But in *ARC of Iowa I*, the court concluded that such a presumption applied because the court also found that an Iowa regulation violated Title II of the ADA and Section 504 of the Rehabilitation Act. *Id.* Neither *Arc of Iowa I*, nor the other cases it cites stand for the proposition that a plaintiff's mere allegation of a civil rights violation automatically supports a finding of the irreparable harm necessary to obtain preliminary injunctive relief. Instead, the presumption Plaintiff relies upon is inextricably intertwined with the issue of success on the merits of the claim that the defendant's conduct violated a civil rights statute. As explained in more detail

16

below, the Court finds that Plaintiff has not met that burden here, and as a result, the district

court's decision in *ARC of Iowa I* does not support Plaintiff's position.

Second, Plaintiff argues that "M.C. faces the loss of the educational opportunity to

be integrated with his neighborhood friends and peers at his neighborhood school." Pl.'s

Mem. at 12, 13. In this way, Plaintiff asserts that she satisfies the irreparable-harm

requirement in a more traditional way: she argues that M.C.'s attendance at Kenwood will

deprive him of friendships and a lack of "continuity and stability" that are important for

his development. Pl.'s Mem. at 12. The Court disagrees. To begin with, none of the cases

cited by Plaintiff support the proposition that requiring a student to attend a school without

neighborhood classmates and friends constitutes irreparable harm. Indeed, none suggests

there is irreparable harm where the record establishes that the student's less-preferred

school placement will provide him with all the services and support required to allow him

to receive an adequate education. For example, Plaintiff cites *Issa v. School District of*

*Lancaster*, 847 F.3d 121, 142 (3d Cir. 2017) for the proposition that "even a few months in

an unsound program can make a world of difference in harm to a child's educational

development." Pl.'s Mem. at 13. But there is no evidence in the record that M.C.'s

placement at Kenwood will constitute an "unsound program." And the showing in this case

is unlike the record before the *Issa* court. There, the plaintiffs presented unrebutted expert

testimony and the testimony of former teachers showing that the programs at the school

where the district preferred to place the students was "unsound" for their educational needs.

847 F.3d at 135 (describing unrebutted evidence); *id.* at 142 (affirming finding of

irreparable harm where, in the absence of injunctive relief, the students would have

remained at a location ill-suited to their needs).[9] Nothing like that is before the Court in this case.

There is no evidence before the Court showing that M.C. will receive an inadequate or inferior education at Kenwood. It is noteworthy that there is no opinion in the record from an expert witness stating that the facilities and services available at Kenwood will deprive M.C. of any needed services or support. Moreover, Ms. Thompson and the District agree on the goals for M.C.'s education as reflected in the IEP. Aside from the fact that M.C. will attend school away from his current friends, the parties agree that the program at Kenwood provides an appropriate educational setting in which to meet the IEP's goals. The record reflects that at the April 16, 2024 meeting, "Ms. Thompson agreed that M.C. should be placed in a DCD-focused classroom, but she felt strongly that M.C. should attend McGuire with his peers from Lakeview." Kuhn Decl. ¶ 16. Ms. McGeary likewise noted that "it's clear that there is a consensus regarding [M.C.'s] need for DCD classroom support." *Id.*, Ex. B at 4. And during elementary school at Lakeview, M.C. received special education services in a DCD-focused classroom. *Id.* ¶ 5. Indeed, at the hearing it became

---

[9] Other cases cited by Plaintiff, Pl.'s Mem. at 13–14, similarly involve circumstances where the absence of injunctive relief was shown to be likely to deprive the student of an opportunity to receive an effective education. *E.g.*, *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108 (1st Cir. 2003) (finding irreparable harm where the student was hearing impaired, required an ASL interpreter, and the school district's failure to provide a certified interpreter would have caused him "to spend a silent, fruitless year in school with only the most remote hopes of being educated"); *Alejandro v. Palm Beach State Coll.*, 843 F. Supp. 2d 1263, 1270–71 (S.D. Fla. 2011) (finding absence of injunctive relief permitting plaintiff to bring a psychiatric support dog to classes would result in irreparable harm because she would be unable to attend class without the dog and "attending class is an important aspect of obtaining a degree").

clear that Plaintiff disagrees only with the location of M.C.'s middle-school placement, not with the educational plan.

In Ms. Thompson's declaration, she explains why she believes M.C. should attend school at McGuire, and the notes from meetings with the District reflect that Ms. Thompson has consistently expressed these same reasons for almost a year. She states that she has "tried all that I know to ensure Lakeville permits M.C. to attend McGuire for the purpose of maintaining his neighborhood friends and classmates from Lakeview. The greatest amount of stability is essential to his emotional well-being which, in turn, is essential to his continued recovery and progress." Thompson Decl. ¶ 4. In addition to Ms. Thompson's declaration, Plaintiff also provides evidence from several of M.C.'s friends expressing their desires that M.C. be placed at McGuire. Further, M.C.'s maternal aunt testified via affidavit about M.C.'s development and opined that requiring M.C. to attend a new school "with all new students is going to result in a significant setback for [him]." Popper Aff. (Doc. 6). And Ms. Thompson's long-time friend similarly states that having M.C. attend a middle school away from his friends and classmates will have a negative impact on him. Cartwright Aff. (Doc. 7).

The Court appreciates the sincerity of the input from Ms. Thompson and M.C.'s many friends. The Court especially respects Ms. Thompson's position about what she feels is best for her son. However, this evidence simply does not show a threat of imminent irreparable harm if M.C. attends Kenwood instead of McGuire. At most, this evidence reflects a genuine concern that M.C. will have difficulty adjusting to middle school. That is true of any student, and the Court does not doubt that M.C.'s adjustment could be more

challenging if he does not have friends he recognizes at Kenwood. But none of this evidence supports a conclusion that Kenwood is an inappropriate setting, nor that M.C.'s attendance there will deprive him of an education. In fact, the record reflects M.C.'s ability to adjust to a new environment. Indeed, Plaintiff acknowledges that when M.C. was required to change schools from JFK to Lakeview, with the services and supports he received in a DCD-focused classroom, he not only made new friends, but "continued to thrive" there. Compl. ¶¶ 6–7 (alleging that when M.C. moved from JFK to Lakeview he "lost all of his friends from school and was required to start at ground zero to develop those relationships," and with the help of his teachers Miller and Wait, M.C. was integrated with his classmates and friends and he "continued to thrive at Lakeview and he made many important friendships with his classmates"); *see also* Pl.'s Mem. at 4 (same). The Court is hopeful that he will show the same admirable resilience at Kenwood.

Accordingly, the Court finds that Plaintiff has failed to show a threat of irreparable harm required to support the issuance of a preliminary injunction.

## B. Likelihood of Success

The Court also concludes that Plaintiff has not shown a likelihood of success on the merits. As noted, Ms. Thompson asserts disability-discrimination claims against the District under the ADA, Section 504 of the Rehabilitation Act, and the MHRA. Compl. ¶¶ 22–40. However, the evidence before the Court does not indicate that there is a fair chance Plaintiff will successfully demonstrate that the District's decision to place M.C. at Kenwood was the product of discrimination because of his disability. Rather, the evidence indicates that the District reached its decision based on its sincere judgment about the

20

middle school placement that would be best suited to M.C.'s individual educational needs. And under existing Eighth Circuit precedent, Ms. Thompson has not shown that the District's decision in this case was made in bad faith or was the result of a gross misjudgment.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Section 504 provides:

> No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a). In relevant part, the MHRA provides that "[i]t is an unfair discriminatory practice to discriminate in any manner in the full utilization of or benefit from any educational institution, or the services rendered thereby to any person because … disability or to fail to ensure physical and program access for disabled persons." Minn. Stat. § 363A.13, subd. 1. The standards applicable to claims under Title II of the ADA and Section 504 claims are the same. *A.J.T. v. Osseo Area Schools, Indep. Sch. Dist. No. 279*, 96 F.4th 1058, 1060 (8th Cir. 2024) ("*AJT II*"); *see also G.P. v. Claypool*, 466 F. Supp. 3d 875, 885 (N.D. Ill. 2020) (describing the standards as "functionally identical"). Court also evaluate MHRA and ADA claims under the same standards. *E.g.*, *Thompson v. Bd. of Special Sch. Dist. No. 1*, 144 F.3d 574, 580 n.4 (8th Cir. 1998). Therefore, the Court will treat these claims together.

A plaintiff asserting a claim of disability discrimination under these laws must make the prima facie showing that the plaintiff "(1) was a qualified individual with a disability; (2) was denied the benefits of a program or activity of a public entity receiving federal funds; and (3) was discriminated against based on [his] disability." *A.J.T. v. Osseo Area Schools, Indep. Sch. Dist. No. 279*, No. 21-cv-1760 (MJD/DTS), 2023 WL 2316893, at *6 (D. Minn. Feb. 1, 2023) ("*AJT I*") (quoting *Est. of Barnwell v. Watson*, 880 F.3d 998, 1004 (8th Cir. 2018)); *see also Doe 1 v. Perkiomen Valley Sch. Dist.*, 585 F. Supp. 3d 668, 686–87 (E.D. Pa. 2022) (same).

"[W]hen the alleged ADA and Section 504 violations are 'based on educational services for disabled children,' a school district's simple failure to provide a reasonable accommodation is not enough to trigger liability." *AJT II*, 96 F.4th at 1061 (quoting *B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882, 887 (8th Cir. 2013)). The plaintiff must also "prove that school officials acted with either bad faith or gross misjudgments, . . . which requires something more than mere non-compliance with the applicable federal statutes." *Id.* (cleaned up). In such a case, the defendant's "statutory non-compliance must deviate so substantially from accepted professional judgment, practice, or standards as to demonstrate that it acted with wrongful intent." *Id.* (quoting *B.M.*, 732 F.3d at 887).

The parties dispute whether Plaintiff is likely to prevail on her claims that the District's decision to place M.C. at Kenwood excludes him from the benefits of the District's programs, services, or activities or otherwise constitutes actionable discrimination because of his disability. Ms. Thompson claims that the District's decision to place M.C. at Kenwood instead of McGuire constitutes disability discrimination because

it is not the product of an individualized assessment of M.C.'s needs and doesn't establish a necessity that he go to school someplace other than his neighborhood school. Instead, she claims that the District has a policy or practice of clumping students with particular disabilities together into certain schools using an unlawful "center-based" approach for administrative convenience.

### *"Cluster Schools" and Nebraska Consent Decree*

First, Plaintiff argues that the District's so-called "center-based" approach results in Lakeville schools creating "cluster sites" into which it funnels its disabled students based on arbitrary or generalized labels, and she contends that this practice runs afoul of the law. In support, she points to a consent decree recently filed in a case in the United States District Court for the District of Nebraska—*United States of America v. Lincoln Public Schools*, No. 4:24-cv-3141 (D. Neb. Sept. 11, 2024). The Consent Decree in *Lincoln Public Schools* was entered between the federal government and the school system where the government alleged that the schools' policy of placing deaf or hard-of-hearing students into so-called "cluster schools" for middle school and high school where ASL interpreters were stationed. In relevant part, under the Consent Decree, the defendant in *Lincoln Public Schools* agreed to only place a student in a "cluster school" if it determined, based on an individualized assessment, that the student needed additional support beyond an ASL interpreter that could be provided only at the cluster school. A copy of the Consent Decree is attached as Exhibit 5 to the declaration of Plaintiff's Counsel. Kane Decl., Ex. 5.

For several reasons, Plaintiff's reliance on the *Lincoln Public Schools* Consent Decree does not show that she is likely to succeed on the merits. First, the Consent Decree

is not binding on this Court in any way. Second, the Consent Decree does not reflect a judgment on the merits of the government's claims in *Lincoln Public Schools*. Instead, it reflects an agreed-upon resolution of the parties' dispute in that case "without trial or further adjudication of any issues of fact or law raised in the Complaint." Kane Decl., Ex. 5 ¶ 13. Moreover, the Consent Decree explicitly states that the defendant "does not admit" any of the government's salient allegations, nor to "any wrongdoing." *Id.*, Ex. 5 ¶ 6.

Third, and most critically, the terms of the Consent Decree do not ultimately support the Plaintiff's position in this case that the District should be required to provide the special education services and programs M.C. needs at his neighborhood school. On its face, the Consent Decree does not require placement at particular schools, but instead requires individualized assessments of the needs of each student. Here, the Plaintiff essentially claims that the District's center-based approach to placement decisions for disabled middle school students is facially discriminatory because it ensures that students with certain forms of disabilities cannot attend their neighborhood schools. To remedy this, Plaintiff claims that the law requires the District to provide all necessary special education services to each disabled student at his or her neighborhood school. The upshot of this claim is that all three middle schools—McGuire, Century, and Kenwood—would be required to fundamentally change their programming to ensure that each school has the proper classrooms, instructors, services, etc., to adequately serve any student with any type of need. But even the *Lincoln Public Schools* Consent Decree does not go so far. There, the parties agreed that if providing an ASL interpreter "in a neighborhood school would fundamentally alter the nature of an LPS service, program, or activity, or would result in undue financial and

administrative burden, then LPS is not required to provide a qualified interpreter in a neighborhood school." Kane Decl., Ex. 5 ¶ 16. Neither the Consent Decree nor any other authority supports the proposition that the District would be required to alter the entire model through which it provides special education services to its disabled students in the manner Plaintiff advocates.

It is true that one form of disability discrimination can involve a public entity's failure to make reasonable accommodations to programs that would "ensure meaningful access" for disabled individuals. *Arc of Iowa II*, 24 F.4th at 1177–78. The accommodations required by the law, however, are reasonable ones. To that end, the law is clear that a defendant is not required to make an accommodation "if it either imposes undue financial or administrative burdens, or requires a fundamental alteration in the nature of the program." *Id.* (quoting *DeBord v. Bd. of Educ. of Ferguson-Florissant Sch. Dist.*, 126 F.3d 1102, 1106 (8th Cir. 1997)).

The District, through Ms. Potter, explained that the decision about where to locate its DCD program was based on several factors, including "environment, accessibility, and staffing." Kuhn Decl., Ex. B at 3. When Plaintiff requested that a DCD program be established at McGuire, the District considered the request closely, but declined to do so. *Id.*, Ex. B at 2. There is no indication such decisions were made for discriminatory reasons, but rather because placing a DCD program at McGuire reflected a fundamental alteration in the nature of the District's special education program, and one that the District found unworkable for a variety of reasons.

25

*Alleged Discrimination*

Finally, based on the record before the Court, Plaintiff is not likely to succeed on the merits of her claims because there is no evidence indicating that the District's middle school placement decision denies M.C. the benefits of the District's programs or services. Nor is there evidence that the District discriminated against M.C. based on his disability. Rather, the record shows that the District based the placement decision on an individualized assessment of his educational needs and their reasoned judgment that Kenwood would meet those needs best.

A significant hurdle for the merits of Ms. Thompson's claims, and one that she has failed to clear at this stage, is the Eighth Circuit's bad-faith-or-gross-misjudgment standard. Although Ms. Thompson argues that this standard rests on a shaky foundation, is inappropriate for disability discrimination cases in the educational environment, and is otherwise flawed, she does not dispute that the standard is still the law in this Circuit. *See AJT II*, 96 F.4th at 1061 n.2 (explaining that the bad-faith-or-gross-misjudgment rule "remains the law of our circuit"). As such, the Court is not free to disregard it, and the record before the Court does not suggest a fair chance that Ms. Thompson will be able to demonstrate that the District acted in bad faith or made a gross misjudgment. Plaintiff has not offered evidence indicating that the District's decision deviated so severely from accepted professional standards that it was likely to have acted with wrongful intent. *Id.* at 1061. Indeed, Plaintiff presents no evidence of what accepted professional standards are in making school placement decisions for a student moving from elementary to middle school, nor any contrary opinions from an educator or special education expert. Rather, the

evidence reflects a reasoned and considerate assessment by the District about M.C.'s educational needs, and that the District drew reasonable conclusions about where those needs would best be served.[10] As a result, even if the District's efforts to address M.C.'s needs "were inadequate" for purposes of fulfilling the ADA and Section 504's requirements of providing meaningful access to the District's programs, Plaintiff has not shown that the District acted with the requisite intent. *See id.*

Further, the evidence in the record shows that Plaintiff would be unlikely to succeed on her statutory claims even if the bad-faith-or-gross-misjudgment rule did not apply. The Court cannot find that Plaintiff is likely to succeed in showing that the District denied M.C. the benefits of a program or activity by assigning him to Kenwood or made a decision to treat him differently because of his disability. 28 C.F.R. § 35.130(a). At Kenwood, M.C. will have his needs met through special education instruction, and he will be able to interact with peers, both within and outside the special education classroom setting. Assuming his education at Kenwood proceeds according to the plan reflected in his most recent IEP, he will join his peers outside the special education classrooms for some purposes (*e.g.*, morning meeting, recess, field trips, etc.), but his goals and needs in the academic and functional areas addressed by his IEP will be met primarily in the special education classroom. Nothing before the Court indicates that by placing M.C. at Kenwood, the

---

[10] In her reply brief and at oral argument, Plaintiff argues that Ms. Kuhn's testimony in her declaration is not credible and that the Court should view it with heavy skepticism at most, or disregard it entirely as a fabrication. Given the record before the Court, it declines Plaintiff's invitation to assume Ms. Kuhn's declaration is intentionally misleading or otherwise lacks credibility.

District will deny him the benefit of its programs. Nor does the evidence indicate that the District is failing to administer its programs "in the most integrated setting appropriate to" M.C.'s needs. 28 C.F.R. § 35.130(d).

Although Plaintiff argues to the contrary, Ms. Kuhn's declaration demonstrates that the District's decision in this case was not based solely on a disability label assigned to M.C., but on an individualized assessment of M.C.'s needs. It shows that the District chose Kenwood because it reasonably believed it was the best setting of the three middle school options to meet M.C.'s needs.[11]

The District did not feel that placing M.C. at McGuire would be suitable because the ASD-focused program at McGuire would be detrimental to his educational goals. In an ASD classroom at McGuire, M.C. would be attending courses alongside students who predominantly perform at the same level or slightly below the level of their regular education peers, and educating M.C. in that environment would require a one-to-one paraprofessional, depriving him of the opportunity to work independently on academics. In addition, the District had concerns that the ASD-focused classroom would be ill-suited to M.C.'s need because he does not require behavior regulation or sensory integration as many of the students who receive special education services at McGuire. The District also

---

[11] The record does not support Plaintiff's argument that the District chose Kenwood over McGuire solely because of concerns over restroom accessibility. Ms. Kuhn makes clear that District staff did initially have accessibility concerns about placing M.C. at McGuire due to his use of a wheelchair. However, after Ms. Thompson clarified during a meeting with M.C.'s special education team what M.C. needs in the bathroom setting, this became an even less significant concern in the District's evaluation. Ultimately, the record shows that the availability of a wheelchair accessible bathroom at McGuire was not the primary reason for the placement decision.

found that the learning environment in McGuire's ASD classrooms could be challenging for M.C. because he needs a calm and quiet environment to do his work, and the ASD classrooms can be loud and would likely be distracting for M.C.

The District considered the special education programming available at Kenwood and how it aligns with M.C.'s needs. That programming is well suited to students, like M.C., who learn at slower rates than their peers, and it has a low student-to-staff ratio, which ensures that special education staff can work individually with students where appropriate. M.C.'s needs are similar to those of other students who are in the type of programming available at Kenwood, including M.C.'s need to learn in a small classroom conducive to repetition and practice. In addition, the District considered that a Kenwood placement would allow M.C. to move into high school alongside the students with whom he attended elementary school at Lakeview.

Given the unrebutted evidence that the District made these individualized determinations so that M.C. would receive an adequate and appropriate education and Plaintiff's concession that the District's programming for M.C. at Kenwood would not deprive him of an education, the only alleged benefit the District allegedly denied to M.C. is that he cannot attend his neighborhood school while peers without disabilities have that opportunity. However, Plaintiff cites no case to support the proposition that under the ADA or Section 504, a school district engages in unlawful disability discrimination by assigning a disabled student to a school that is not his or her neighborhood school. Nor does Plaintiff site a single case in which a court has found a discriminatory practice where, as here, the

record shows that the school district reached that conclusion after thoroughly considering which school would better serve the student's needs.

For these reasons, the Court concludes that Plaintiff has not met her burden to show that she is likely to succeed on the merits.

## III.   Conclusion and Order

Because the Court finds that Plaintiff has shown neither a threat of irreparable harm nor that she is likely to succeed on the merits of her claims, and in the interest of providing the parties with a timely decision, the Court declines to discuss the remaining *Dataphase* factors—the public interest and balance of harms.

For the reasons stated in this Order, the Plaintiff's motion for a preliminary injunction is **DENIED**.

Date: October 8, 2024                          *s/Katherine Menendez*
                                               Katherine Menendez
                                               United States District Judge